# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karen M. Chambers,

                    Plaintiff,

v.

The Travelers Companies, Inc.,

                    Defendant.

**MEMORANDUM OF LAW & ORDER**
Civil File No. 08-5947 (MJD/JJK)

---

Thomas Glennon, Thomas Glennon & Associates, P.A., Counsel for Plaintiff

Charles F. Knapp and Julie M. Giddings, Faegre & Benson LLP, Counsel for Defendant

---

## I.      INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment. [Docket No. 77] The Court heard oral argument on Friday, November 19, 2010.

## II.     SUMMARY OF COURT'S OPINION

After considering the documents filed and the oral arguments, the Court will grant Defendant The Travelers Companies, Inc.'s ("Travelers") Motion for Summary Judgment on all counts of Plaintiff Karen Chambers' ("Chambers")

Third Amended Complaint("TAC").  Plaintiff alleges a number of claims against

Travelers relating to her termination.  These allegations include defamation,

breach of contract, statutory wage violation, age discrimination, and benefit

interference.  With regard to all counts, Travelers has shown that no genuine

disputes exist as to any material facts, and Chambers' claims all fail as a matter of

law.  Accordingly, the Court will grant Travelers' motion.

## III.    FACTUAL BACKGROUND

### A. Parties and Witnesses

Defendant, Travelers is a Minnesota corporation, which provides

insurance products and other related services.  Plaintiff Chambers is a resident of

Minnesota.  Chambers began her employment with Travelers' predecessor

company, The St. Paul Companies, beginning in 1987.  She continued her

employment with St. Paul Companies and Travelers for over twenty years, until

she was terminated by Travelers on January 21, 2008.  At the time of her

termination, Chambers was employed as a Managing Director of Bond and

Financial Products.  Furthermore, at the time she was terminated from her

employment, Chambers was 52 years-old.

At all relevant times, Kurt Werner ("Werner") was Chambers' direct supervisor. When Chambers was discharged, Werner was 50 years-old. At all relevant times, Chambers' second-level supervisor was Homer Sandridge ("Sandridge"). When Chambers was discharged, Sandridge was 59 years-old. At all relevant times, Michele Cady ("Cady") was a human resources manager with Travelers who conducted an "environmental assessment" of Chambers' subordinates, and was involved in Travelers' decision to discharge Chambers.

## B. Chambers' Employment

Chambers began her employment with The St. Paul Companies, Inc. in 1987. In 2004, The St Paul Companies, Inc. merged with Travelers, and Chambers became an employee of Travelers. In her position of Managing Director, Chambers was responsible for managing a team of six underwriters. Prior to the incidents involved in this case, Chambers had never received a verbal or written warning from Travelers pertaining to her employment. In 2005, Chambers received a performance review which rated her employment performance as a 3, or meeting the expectations and requirements of her position. For her employment in 2005, Chambers received a bonus of $32,000 and was awarded 201 shares of restricted stock in early 2006. In 2006, Chambers

again received a performance rating of 3.  In early 2007, she received a bonus of $30,000 and 208 shares of restricted stock for her employment in 2006.

On September 26, 2007, Chambers was given a mid-year performance review by Werner.  In that review, Werner noted that Chambers was meeting all the requirements of her position.  In two of the seven categories listed under Objectives/Development Plan, Chambers received ratings of 2, meaning that Chambers was exceeding department standards and expectations in those areas. For the other five categories, Chambers received a rating of 3, meaning that Chambers was meeting all of her requirements in those areas.  In particular, with regard to leadership and teamwork, the performance review noted that Chambers had "done a very good job in this area on several fronts including developing a positive working environment both vertically and horizontally." Further, she was praised for delivering "good results through June despite extremely difficult market conditions."  Werner testified that the goals and objectives laid out in these types of reviews, in part, determine an employee's consideration for a bonus.

In September 2007, one of Chambers' employees informed Cady of some issues the employee was having with regard to her employment.  This employee

was subject to a performance improvement plan at the time she raised these concerns. Among the issues the employee raised were that Chambers had a controlling management style, caused stress in the workplace, sold items in the office, and criticized employees in front of their peers.

### C. Environmental Assessment of Chambers' Subordinates

In light of these issues, Cady, Werner, and Sandridge decided to conduct an "environmental assessment" of Chambers' group in order to elicit information from Chambers' subordinates concerning their feelings about their work environment. This assessment would entail Cady interviewing each of Chambers' subordinates by asking them questions with regard to their work environment. The "environmental assessment" of Chambers' group was the first such assessment Cady had done at Travelers and was the first such assessment that had been used for an employee under Werner's supervision.

Cady interviewed each of Chambers' six subordinates in early October of 2007. These interviews presented several issues concerning Chambers' employment. Chambers' subordinates noted, among other things, that morale in the group was low, that they were fearful of Chambers due to her management style, that Chambers' communication to the group was often unsatisfactory, and

that Chambers could be rude, condescending, and mean.  Furthermore, several of Chambers' subordinates stated that Chambers brought religion into the workplace, that Chambers solicited her employees to buy items to support church mission trips, and that Chambers required her exempt subordinates to take a half day of paid time off when they needed to leave early for whatever reason.  One employee noted that Chambers made a comment that homosexuality was "ruining the world."  Finally, several of the employees informed Cady that they felt that there was not much potential for growth in their current positions, and that they were fearful of posting for another job because of the potential repercussions.

As a result of these interviews, Cady, Werner, and Sandridge met with Chambers on October 10, 2007 to discuss the issues identified by her staff through the "environmental assessment".  Prior to this meeting Cady had recommended that Chambers be removed from her management role immediately.  At this meeting, Chambers was informed about the results of the "environmental assessment" of her group.  Chambers was not however informed of any specific instances of the alleged wrongful conduct or told which employees made which complaints.  Cady testified that in this meeting she

shared the facts which were reported to her, and that it was not her "role to tell if they [were] true or not."

Chambers originally testified that Cady did all of the talking at the October 10, 2007 meeting. Subsequently, Chambers has stated that at this meeting Werner was the person who spoke, noting that Werner stated that Chambers was rude, condescending, and mean toward her staff, engaged in inappropriate conduct, was volatile and caused employees to be uncomfortable, caused employees to be fearful of repercussions, caused a majority of her employees to want to leave employment, was responsible for low morale in the office, improperly elicited sexual preference dialogue in the workplace, had violated Travelers' non-solicitation policy, failed to communicate clearly and consistently with her staff, improperly disclosed confidential information concerning her employees, and violated federal wage and hour laws. Chambers further notes that Werner accused her of imposing her religious views on her staff and pressuring her staff to buy fundraising items sold by her church. This meeting was the first instance Chambers was informed of these matters.

On October 11, 2007, Chambers asked to meet with Sandridge and Werner in order to discuss the previous days' meeting and the "environmental

assessment".  Chambers wanted to inform Sandridge and Werner that she felt what HR did in the October 10, 2007 meeting was wrong.    More specifically, Chambers informed Werner and Sandridge that she did not like that HR had taken allegations and treated them as facts.

On October 22, 2007, Werner gave Chambers a document entitled "Written Behavioral Warning" which summarized the concerns raised by Chambers' employees.  The warning noted six areas which required improvement: (1) Inappropriate Behavior and Comments, (2) Religion and Sexual Preference Comments, (3) Solicitation, (4) Clarity of Communication, (5) Confidentiality, and (6) PTO Time.  The expected duration of the warning period for this written warning was thirty days.  Although the warning period was expected to only be thirty days, Sandridge testified that the warning period extended until Chambers was terminated.  Further, Sandridge testified that he was not aware of any communication informing Chambers that the period had extended beyond the originally expected thirty days.

The warning stated that Werner would meet with Chambers on a weekly basis in order to discuss Chambers' "progress in meeting the requirements of [Chambers'] position, and specifically the items addressed above."  Furthermore,

the warning stated that at the end of thirty days, Cady would meet with Chambers and her staff in order to follow up on the "environmental assessment" and to provide feedback to both Chambers and Werner.

Chambers met with Werner twice during the thirty day period. On November 1, 2007, Chambers spoke with Werner and was told that there were no reported incidents or issues to discuss and that progress was noted in some of the areas specified in the written warning. On November 12, 2007, Chambers again spoke with Werner and was told that there were no reported incidents to discuss and that progress was noted in some of the areas specified in the written warning.

At this point, Werner and Sandridge began to discuss what options were available in order to allow Chambers to continue her employment with Travelers. Werner and Sandridge were attempting to find a way in which they could move Chambers into a non-management position.

### D. Follow-up Assessment

In late November and early December, Cady conducted a follow up assessment with Chambers' staff. Cady again asked Chambers' employees questions in order to determine if things had changed in the areas which Cady

discussed with the employees in the initial interviews.  The results of these interviews showed that the employees felt that in some areas things had improved, but also raised some continuing and additional concerns.  Some of the employees noted that Chambers had been out of the office much of the month and that contributed to an increase in morale.  Other concerns raised were that morale was still not great, there was continued fear of Chambers, as well as continued issues with Chambers' communication.  Finally, one employee mentioned that Chambers had brought her daughter and 5 year-old grandson to Las Vegas with her on a business trip, and that her daughter and grandson attended business meetings with Chambers.

In late December and early January, Cady and Sandridge received unsolicited complaints from three of Chambers' six employees.  Werner and Sandridge continued their discussion of creating a new non-management position for Chambers.  At this time, Werner and Sandridge planned to issue Chambers a First and Final Warning and transfer her to another job within the company.  Ultimately, this warning was never given to Chambers before she was terminated.

On January 8, 2008, Cady and Werner met with Chambers to discuss the results of the follow up assessment.  Among other things, when asked at this meeting whether she took her daughter and grandson with her on a trip to Las Vegas, Chambers acknowledged that her daughter came along, but did not state that her grandson came as well.

On January 9, 2008, Travelers received an allegation that Chambers had expensed her daughter's and grandson's meal at an agency dinner in Las Vegas.  Travelers subsequently discovered that Chambers had brought her daughter and grandson with her to an agency dinner, and had submitted an expense form for the cost of her family members' food and drinks without noting their attendance.  Chambers testified that her failure to note the attendance of her daughter and grandson on the receipt of the meal and the expense reimbursement report was an error.

**E.  Discharge of Chambers**

Due to concerns about Chambers judgment and continued issues with her subordinates, Werner and Sandridge determined that Chambers was to be discharged.  On January 21, 2008, Werner, Cady, and an employee relations

manager met with Chambers, and she was informed that she was being terminated for "continuing issues."

Following Chambers' termination, her responsibilities and supervision of Chambers' staff was taken over by Patty McCarron, who was 51 years-old. Travelers ultimately hired Brent Rothgeb, who was 44 years-old, to take over many of Chambers' responsibilities and supervise the team of underwriters. Rothgeb was hired as a Managing Account Underwriter, a step below Chambers' position, but a position which entails the same supervision duties that Chambers had before being discharged.

### F. Travelers Policies and Practices

#### i. Bonus Policies

Travelers' bonus policy states that bonuses "are discretionary awards used to reward superior performance." Travelers' employee handbook states that bonuses "are given at the discretion of management, and no specific performance rating guarantees [a] payout." Finally, according to Travelers' bonus policy, an employee must be employed on the date which bonuses are paid out in order to be eligible for a bonus. Bonuses for 2007 were paid out on February 15, 2008.

Sometime in November of 2007, Chambers' supervisors inputted a performance rating of 4 for Chambers, which means that Chambers was meeting some but not all expectations of her job. This rating was inputted without Chambers receiving a performance review. Due to her work performance, Chambers' supervisors decided that she would not receive a bonus for 2007.

### ii. Pension Policies

All full-time employees of Travelers are eligible to receive pension benefits after completing one year of employment. After five years of vesting service at Travelers, an employee is 100% vested. In 2001 and 2003, employees of the St. Paul Companies had the opportunity to choose between two ways of having their pension benefits determined, a "cash balance formula" or a "traditional" formula. Chambers elected the traditional formula. Neither Sandridge nor Werner was aware of the pension plan which Chambers had selected.

### iii. Severance Policies

Travelers' severance plan states that an employee may qualify to receive severance pay if "Travelers terminates your employment due to a reduction in force or because Travelers eliminates your position." Under Travelers' severance

plan, an employee does not qualify for severance if "employment is terminated due to inadequate job performance, even if your position is not filled."

### G. Procedural History

On approximately October 10, 2008, Plaintiff commenced this lawsuit in Ramsey County District Court. On November 10, 2008, Travelers removed the case to this Court based on federal question jurisdiction. On March 30, 2009, Count I of Plaintiff's Second Amended Complaint, alleging defamation against Travelers, was dismissed without prejudice. [Docket No. 27] Subsequently, Plaintiff filed her Third Amended Complaint. [Docket No. 29] Plaintiff's Third Amended Complaint alleges five counts against the Defendant: (1) Defamation, (2) Breach of Contract, (3) Violation of Minn. Stat. § 181.13, (4) Age Discrimination in violation of the Minnesota Human Rights Act ("MHRA"), and (5) Interference with Plaintiff's ERISA Rights in violation of 29 U.S.C. § 1140. On August 31, 2010 Travelers filed a Motion for Summary Judgment on all counts. [Docket No. 77]

## IV. DISCUSSION

### A. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The party seeking summary judgment bears the burden of showing that there is no genuine dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Summary judgment is only appropriate when "there is no dispute of fact and where there exists only one conclusion." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994) (citation omitted).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Factual disputes that are irrelevant or unnecessary will not be counted. (Id.) "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in [that party's] favor.'" Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

**B. Plaintiff's Motion for a Continuance**

Pursuant to former Rule 56(f) of the Federal Rules of Civil Procedure, Chambers requests that this Court deny or defer its determination of Travelers' Motion for Summary Judgment until Travelers has fully complied with Chambers' discovery requests and Chambers has completed her discovery.  As of December 1, 2010, Rule 56(f) is recodified as Rule 56(d).  This recodification however, "carries forward without substantial change the provisions of the former subdivision (f)."  Fed. R. Civ. P. 56(d) 2010 amend. cmt. (2010).  Rule 56(d) states:

> If a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may:
>
> > (1) defer considering the motion or deny it;
> >
> > (2) allow time to obtain affidavits or declarations or to take discovery; or
> >
> > (3) issue any other appropriate order.

Fed. R. Civ. P. 56(d).  "To obtain a Rule 56(f) continuance, the party opposing summary judgment must file an affidavit 'affirmatively demonstrating . . . how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" Ray v. Am. Airlines, Inc., 609 F.3d 917, 923 (8th Cir. 2010) (citation omitted).  In

this affidavit the non-moving party must show "what specific facts further discovery might uncover." <u>Anuforo v. Comm'r of Internal Revenue</u>, 614 F.3d 799, 808 (8th Cir. 2010) (citation omitted).

The Court denies Chambers' request for a continuance pursuant to Rule 56(d). Chambers identifies a number of alleged problems with Travelers responses to Chambers' discovery requests. The majority of Chambers' affidavit concerns documents which Chambers argues were produced belatedly. Chambers does not explain what specific facts she will uncover because of the late production of these documents. Further, Chambers does not point to specific discovery which she would be able to obtain in light of these documents. Rather Chambers' counsel requests that Chambers should receive "all relevant information and documents not timely produced and/or improperly withheld," and that Chambers should be allowed to "conduct and complete such discovery as is appropriate in light of such information/documents before Plaintiff is required to respond to Travelers' Motion for Summary Judgment <u>and</u> before this Court decides such motion in this action, pursuant to Fed. R. Civ. P. 56(f)." (Glennon Aff. Pursuant to Fed. R. Civ. P. 56(f) ¶ 33) This broad request does not meet the requirements of Rule 56(d), which requires Chambers to identify

specific facts that further discovery might uncover, and show how those facts are relevant in rebutting Travelers showing that there is an absence of genuine issues of material fact. <u>Ray</u>, 609 F.3d at 923.

Additionally, the timing of this request, as well as the circumstances in which the request was made, provides this Court with justification for denying Chambers' request for a continuance. This is not a case in which the Plaintiff has had an inadequate time for discovery. This case was filed two years ago, discovery in this case lasted for nearly a year, the discovery period for this case expired over five months before this motion for a continuance was brought, Chambers failed to raise a number of these alleged discovery deficiencies during the discovery period through motions to compel, and Chambers failed to object to orders by Magistrate Judge Keyes denying Chambers' requests for discovery. Given these facts, the Court will deny Chambers request for a continuance pursuant to Rule 56(d).

## C. Defamation Claim

Chambers alleges that she was defamed by Werner (1) verbally at the October 10, 2007 meeting in the presence of Sandridge and Cady, (2) in writing through the written warning given to Chambers on October 22, 2007, which was

published to Sandridge and Cady, and (3) at the January 21, 2008 meeting in which Chambers was terminated for "continuing issues" in the presence of Cady and a Travelers employee relations manager. (TAC ¶¶ 12-14)

"To establish a defamation claim, a plaintiff must prove three elements: (1) the defamatory statement is 'communicated to someone other than the plaintiff,' (2) the statement is false, and (3) the statement 'tend[s] to harm the plaintiff's reputation and to lower [her] in the estimation of the community.'" <u>Bahr v. Boise Cascade Corp.</u>, 766 N.W.2d 910, 919-20 (Minn. 2009) (citation omitted). Defamation which affects a "plaintiff in his business, trade, profession, office or calling," is defamation per se and is "thus actionable without any proof of actual damages." <u>Stuempges v. Parke, Davis & Co.</u>, 297 N.W.2d 252, 255 (Minn. 1980). In a claim for defamation, a plaintiff must plead who made the alleged defamatory statement, to whom the statements were made, and where the statements were made. <u>Pope v. ESA Servs., Inc.</u>, 406 F.3d 1001, 1011 (8th Cir. 2005) (citation omitted). Defamatory statements not contained in a plaintiff's complaint are beyond the scope of plaintiff's claim. <u>Benson v. Northwest Airlines, Inc.</u>, 561 N.W.2d 530, 538 (Minn. Ct. App. 1997).

Even if a statement is defamatory, there is no actionable claim if the statement is privileged.  <u>Stuempges</u>, 297 N.W.2d at 256.  Whether a statement is privileged is a matter of law for the court to decide.  <u>Palmisano v. Allina Health Systems, Inc.</u>, 190 F.3d 881, 885 (8th Cir. 1999) (citing <u>Lewis v. Equitable Life Assurances Soc'y of the United States</u>, 389 N.W.2d 878, 89-90 (Minn. 1986).  For a statement to be privileged, "it must be made upon a proper occasion, from a proper motive, and must be based upon reasonable or probable cause."  <u>Stuempges</u>, 297 N.W.2d at 256-57.  As a matter of law, "[c]ommunications between an employer's agents made in the course of investigating or punishing employee misconduct are made upon a proper occasion and for a proper purpose."  <u>McBride v. Sears, Roebuck & Co.</u>, 235 N.W.2d 371, 374 (Minn. 1975).  "Reasonable grounds can exist if a person has valid reasons for believing a statement, even though the statement later proves to be false."  <u>Elstrom v. Indep. Sch. Dist. No. 270</u>, 533 N.W.2d 51, 55 (Minn. Ct. App. 1995) (citation omitted).

However, "a qualified privilege is abused, and therefore lost if the plaintiff demonstrates that the defendant acted with actual malice."  <u>Lewis</u>, 389 N.W.2d at 890 (citation omitted).  Whether a privilege has been abused is a question of fact, but where there is insufficient evidence for a finding of malice the question

should not be submitted to the jury.  <u>Brown v. Westaff (USA), Inc.</u>, 301 F. Supp.

2d 1011, 1021 (D. Minn. 2004) (citing <u>Buchanan v.  Minn. State Dept. of Health</u>,

573 N.W.2d 733, 738 (Minn. Ct. App. 1998).  To prove actual malice, a plaintiff

must show that the defendant "made the statement from ill will and improper

motives, or causelessly and wantonly for the purpose of injuring the plaintiff."

<u>Stuempges</u>, 397 N.W.2d at 258 (citation omitted).  Malice is not proven by the fact

that the statement was made or because the statement is later proven false.  <u>Bahr</u>,

766 N.W.2d at 920.  It is important to note however that where an employer does

not conduct a thorough investigation or the investigation is cursory an

employer's statements are not privileged.  <u>Keuchle v. Life's Companion P.C.A.,</u>

<u>Inc.</u>, 653 N.W.2d 214 (Minn. Ct. App. 2002).

      **i.  October 10, 2007 Meeting**

In Count One, Chambers alleges that on October 10, 2007, in the presence

of Sandridge and Cady, Werner defamed her by verbally stating that Chambers:

> was rude, condescending mean, and angry toward her staff;
> engaged in inappropriate conduct; was volatile and made
> employees very uncomfortable; caused employees to be fearful of
> repercussion; caused a majority of her subordinate employees to
> want to leave employment; was responsible for low morale in the
> office; improperly solicited religious dialogue in the workplace;
> improperly solicited sexual preference dialogue in the workplace;
> created fear among employees; had violated Travelers' non-

solicitation policy; failed to communicate clearly and consistently with her staff; improperly disclosed confidential and private information concerning supervised employees; violated federal [w]age and hour laws in administering her staff's personal time off; and had engaged in "performance and behavior deficiencies."

(TAC ¶¶ 12, 14)

In her deposition, Chambers testified that the person who spoke at this meeting was Cady, and not Werner. This testimony is fatal to a claim that Werner defamed her verbally at the October 10, 2007 meeting. Chambers did submit an affidavit which states that Werner was the person who spoke at the October 10, 2007 meeting. This affidavit, however, is contradictory to Chambers' deposition testimony which stated that Cady was the person who spoke at the meeting. A party may not withstand a motion for summary judgment by submitting an affidavit which contradicts prior deposition testimony because "[o]therwise, any party could head off a summary judgment motion by supplanting previous depositions ad hoc with a new affidavit, and no case would ever be appropriate for summary judgment." Wilson v. Westinghouse Elec. Corp., 838 F.2d 286, 289 (8th Cir. 1988).

Nonetheless, even if Chambers had adequately alleged that defamatory statements were made at the October 10th meeting, her defamation claim would

fail because the statements were protected by qualified privilege. As a matter of

law, "[c]ommunications between an employer's agents made in the course of

investigating or punishing employee misconduct are made upon a proper

occasion and for a proper purpose." McBride, 235 N.W.2d at 374. Moreover, the

statements made at the October 10th meeting were based upon reasonable or

probable cause. The company conducted an investigation into the concerns

raised by Chambers' employees, interviewed all of Chambers' employees, and

personally discussed the results of these interviews with Chambers. These

concerns and complaints were raised by multiple subordinates of Chambers. For

these reasons Travelers had valid reasons for believing the statements made. See

Elstrom, 533 N.W.2d at 55 (finding that reasonable grounds existed where an

investigator interviewed students regarding their teacher's conduct, even though

all the students did not feel that the teacher behaved inappropriately, because the

investigator was free to reach a different conclusion and there was no evidence

that the superintendent who made the statement doubted the accuracy of the

investigator's conclusions). Accordingly, the alleged defamatory statements are

entitled to qualified privilege. Qualified privilege can only be defeated by a

showing of actual malice.  There is no showing of actual malice, and thus the statements are entitled to qualified privilege and are not actionable.

Chambers argues that Travelers' statements are not privileged because the "environmental assessment" conducted by Travelers provided an inadequate investigation because it was not designed to elicit positive statements about the work environment and Travelers did not attempt to verify whether the statements made by Chambers' employees were true and accurate.  Further, Chambers argues that the investigation was cursory because Travelers failed to interview Werner as part of the "environmental assessment."  Although Chambers contends that Travelers' statements are not entitled to qualified privilege because the "environmental assessment" was only a cursory investigation, the evidence establishes that Travelers' investigation of Chambers' employment was thorough, and Travelers' personnel had reasonable grounds to believe the statements in question.  Travelers spoke with all the employees that worked for Chambers and asked them open-ended questions concerning their work environment.  Travelers subsequently discussed the content of those interviews with Chambers in order to get her reaction to the concerns which were raised.  Furthermore, these concerns were noted by several different

employees in independent interviews.  Although Werner was not interviewed,

Werner was the person receiving information and making decisions, thus an

interview of him would have been superfluous since he did not need to be

interviewed in order to consider his own experiences with Chambers.

Accordingly, Travelers had reasonable grounds to believe the validity of the

statements, and thus the statements were privileged.  Even if Chambers had

adequately pled a defamation claim relating to the statements made at the

October 10, 2007 meeting, summary judgment would be granted with regard to

that claim.

### ii.  October 22, 2007  Written Warning

Chambers alleges that the Werner defamed her in writing through the

Written Behavioral Warning she was given by Werner on October 22, 2007,

which restated the issues discussed at the October 10th  meeting.  (TAC ¶¶ 12,

14)  For the same reasons discussed above, the statements made in the written

warning of October 22, 2007, are entitled to qualified privilege.  Accordingly,

since there is no showing of actual malice by Chambers, her defamation claim

relating to the written warning must be dismissed.

### iii.  Chambers' Discharge for Continuing Issues

Chambers alleges that Werner made defamatory statements in a meeting on January 21, 2008, where Chambers was terminated for "continuing issues" with her employment.  (TAC ¶ 14)

The Court finds that this statement cannot sustain a defamation claim. "Whether a statement can be interpreted as stating facts or can be proven false is a question of law." McClure v. Am. Family Ins., 223 F.3d 845, 853 (8th Cir. 2000) (quoting Hunter v. Hartman, 545 N.W.2d 699, 706 (Minn. Ct. App. 1996)).  The factors considered in determining whether a statement is false according to Minnesota law are "(1) specificity and precision [of the statement]; (2) verifiability; (3) literary and social context in which it was made, and (4) public context." Id. (citation omitted).  The only reason Travelers gave Chambers for her termination was "continuing issues."  The Court finds that this statement is insufficiently precise and cannot be proven false.  See Osterberg v. Sears, Roebuck & Co., No. 03-6000 (RHK/AJB), 2004 WL 2186407, at *3-4 (D. Minn. Sept. 22, 2004) (holding that where an employee was fired for "ethical concerns and disregard for company policies and procedures" there was not an actionable claim for defamation because the statement was there was no provably false statement of fact).  Chambers herself testified that she was unclear as to what

"continuing issues" meant. For these reasons, Werner's statement on January 21, 2008 that Chambers was being terminated for "continuing issues" is imprecise and cannot be proven false, and as such cannot sustain a claim of defamation.

Even if the Court held that the statement was sufficiently defamatory, the statement would be protected by qualified privilege for the same reasons the previously discussed statements were protected by privilege.

### iv. Self-Publication

In addition to the allegations above, Chambers alleges that she was forced to self-publish the defamatory statements discussed above to a number of people, including potential employers. (TAC ¶ 14) "Generally, there is no publication where a defendant communicates a statement directly to a plaintiff, who then communicates it to a third person." Lewis, 389 N.W.2d at 886 (citation omitted). The Minnesota Supreme Court has, however, recognized an exception to this rule through the doctrine of compelled self-publication. Id. at 888. According to this doctrine, the originator of the defamatory statement is liable for damages caused by the statement, where the originator knew or should have known that the defamed person would be compelled in certain circumstances to

publish the statement.  Id.  The Minnesota Supreme Court has articulated that

this exception, "should be cautiously applied."  Id.

Importantly, in recognizing this doctrine the Minnesota Supreme Court

stated that:

> The logic of imposing liability upon a former employer in a self-publication case appears to compel recognition of a qualified privilege.  A former employer in a compelled self-publication case may be held liable as if it had actually published the defamatory statement directly to prospective employers.  Where an employer would be entitled to a privilege if it had actually published the statement, it makes little sense to deny the privilege where the identical communication is made to identical third parties with the only difference being the mode of publication.

Id. at 889-90.  Accordingly, if an employer would be privileged to make the

statement in question, then self-publication of that same statement is subject to

the privilege as well.  "In the context of employment recommendations, the law

generally recognizes a qualified privilege between former and prospective

employers as long as the statements are made in good faith and for a legitimate

purpose."  Id. at 889 (citation omitted).  "It is in the public interest that

information regarding an employee's discharge be readily available to the

discharged employee and to prospective employers."  Id. at 890. (citation

omitted).

In this case, if Travelers would have published the reasons for Chambers' discharge to other employers, these statements would have been protected by privilege. Accordingly, the qualified privilege applies to Chambers' claim of defamation by self-publication. Since there is no showing of actual malice, the Court grants summary judgment in favor of Travelers on this claim.

### D. Breach of Contract Claim

Chambers claims in Count Two that her contract of employment stated that she would receive bonus compensation in addition to her salary in 2007. (TAC ¶ 20) Chambers argues that this fact coupled with Travelers refusal to pay Chambers her 2007 bonus upon request constitutes breach of contract.

"A claim of breach of contract requires proof of three elements: (1) the formation of a contract, (2) the performance of conditions precedent by the plaintiff, and (3) the breach of the contract by the defendant." Thomas B. Olson & Assocs., P.A. v. Leffert, Jay, & Polgaze, P.A., 756 N.W.2d 907, 918 (Minn. Ct. App. 2008). Chambers did not have a written employment contract with Travelers guaranteeing her a bonus, and thus her claim relies on a finding that a unilateral contract was formed between Chambers and Travelers.

In order for a unilateral employment contract to be formed there needs to be (1) an offer; (2) communicated to and accepted by the offeree; and (3) consideration. <u>Grenier v. Air Express Int'l Corp.</u>, 132 F. Supp. 2d 1198, 1200 (D. Minn. 2001) (citations omitted).  Whether a unilateral contract has been formed is a question of law.  <u>Martens v. Minnesota Mining & Mfg., Co.</u>, 616 N.W.2d 732, 740 (Minn. 2000).  "If an offer is so indefinite as to make it impossible for a court to decide what it means and to fix exactly the legal liabilities of the parites, its acceptance cannot result in an enforceable contract."  <u>Grenier</u>, 132 F. Supp. 2d at 1201.

Chambers, in her deposition testimony, admitted that being eligible for a bonus did not entitle her to a bonus, that she received documents which stated that bonuses were discretionary, that she was aware that receiving a bonus one year did not entitle her to a bonus in a later year, and that she did not have any guarantee of a bonus in 2007.  All of the documents discussing Travelers' bonus policy clearly state that the awarding of bonuses is within the discretion of Travelers.  The fact that discretion is left with Travelers to determine whether its at will employees receive bonuses precludes a finding that a unilateral contract between Chambers and Travelers was formed concerning Chambers' 2007

bonus, because there is no clear offer, and thus it is not possible for the Court to fix the legal liabilities of the parties.  See Grenier, 132 F. Supp. 2d at 1201 (citations omitted) (holding that no unilateral contract was formed where the defendant had discretion to determine what qualified as new business under a sales incentive plan); see also Stearns v. Ag-Chem. Equip. Co., Inc., No. Co-91-933, 1991 WL 209998, at *4 (Minn. Ct. App. Oct. 22, 1991) (stating that there was no unilateral contract for a bonus because the plaintiff admitted the bonus was discretionary).  Since there is no unilateral contract, Chambers' breach of contract claim must fail as a matter of law.

Furthermore, even if the Court found that the language of Travelers' bonus policies did not preclude the formation of a unilateral contract, the fact that Travelers had discretion to determine whether or not to pay Chambers a bonus would preclude a finding of breach of contract.  Grenier, 132 F. Supp. 2d at 1201(citations omitted) (holding that even if a contract had been formed the fact that the defendant could exercise its discretion to determine what qualified as new business under a compensation plan precluded a finding of breach of contract).  Thus, Chambers' breach of contract claim would still fail, and Travelers would still be entitled to summary judgment.

Chambers argues that her 2007 bonus was not discretionary, because she had in fact earned her bonus. Chambers contends that through her communications with Travelers, the course of dealing between Travelers and her, and the fact that she had satisfied all the conditions necessary for receipt of her 2007 bonus, her bonus was compensation that was due and owing to her at the time of her termination. Chambers cites to <u>Kvidera v. Rotation Eng'r & Mfg. Co.</u>, 705 N.W. 2d 416 (Minn. Ct. App. 2005) to strengthen this assertion. In <u>Kvidera</u> the court found that the plaintiff's bonus constituted earned wages, because the plaintiff had contracted with the employer to receive a bonus based upon the satisfaction of specific objectives and a subjective personal evaluation. <u>Id.</u> at 423. Although the amount was not determined, plaintiff's right to receive the bonus vested the day after the expiration of his employment contract, and thus the bonus was due and owing to the plaintiff prior to his termination. <u>Id.</u> Chambers argues that like the plaintiff in <u>Kvidera</u>, her rights to her bonus vested when she satisfied all the conditions relating to receiving her 2007 bonus. Chambers reliance on <u>Kvidera</u> is misplaced however, because, unlike the plaintiff in <u>Kvidera</u>, Chambers did not have an explicit contract with Travelers which stated that she would receive a bonus if she met certain conditions. She

was an at-will employee who simply was eligible to receive a bonus at Travelers'

discretion.

It is clear from Chambers' testimony and the language of Travelers'

policies that she was aware that the payment of bonuses was discretionary.  All

communications that Travelers had with its employees concerning bonuses

stressed the fact that such variable compensation was discretionary.  This is not a

case in which Chambers had a written employment contract which guaranteed

her a bonus at the end of the year.  Rather she was an at will employee who,

according to the policies of Travelers, was eligible to receive a bonus, which

Travelers decided she did not deserve due to her work performance in 2007.

Accordingly, Chambers' claim for breach of contract with regard to her 2007

bonus must be dismissed.

### E.  Claim under Minnesota Statute § 181.13

In Count Three, Chambers alleges that she earned compensation for her

work in 2007 under her employment contract, she demanded that she be paid

this money, and was refused by Travelers.  (TAC ¶ 30-31)  Chambers alleges that

this refusal violated Minn. Stat. § 181.13.

Minn. Stat. § 181.13 provides that when an employer discharges an employee the "wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee." An earned bonus constitutes wages "[w]hen an employee contracts for a bonus in exchange for his services to the employer, and the right to that bonus vests prior to the employee's termination." Kvidera, 705 N.W.2d at 423.

Ultimately, Chambers' § 181.13 claim fails for the same reasons her breach of contract claim fails. Travelers' policies provide that any bonuses paid to employees are discretionary, and as such Chambers was not entitled to a bonus, even though she had received bonuses in previous years. It cannot be said that Chambers had earned her bonus, because whether she received a bonus was discretionary, and Travelers determined that due to her work performance she was not entitled to a bonus in 2007. Accordingly, summary judgment will be granted in relation to Chambers' § 181.13 claim.

**F. Age Discrimination under the Minnesota Human Rights Act**

The MHRA prohibits an employer from making adverse employment decisions against an employee on the basis of the employee's age. Minn. Stat. § 363A.08 (2010). Claims under the MHRA are analyzed using the same standards

that apply to a claim brought under the Age Discrimination in Employment Act.

Lewis v. St. Cloud State Univ., 467 F.3d 1133, 1138 (8th Cir. 2006).  Where, as in this case, no direct evidence of discrimination is presented, a claim of age discrimination in violation of the MHRA is analyzed by using the burden shifting analysis set forth in McDonnell Douglas Corp. v. Green. 411 U.S. 792 (1973).  Chambers v. Metro. Prop. & Cas. Ins. Co., 351 F.3d 848, 855 (8th Cir. 2003) (citation omitted).  According to this analysis, Chambers must first establish a prima facie case of age discrimination.  Id.  If Chambers can establish a prima facie case, the burden shifts to Travelers to articulate a non-discriminatory reason for terminating Chambers.  Id.  Finally, if Travelers can articulate a non-discriminatory reason for discharging Chambers, the burden shifts again to Chambers to demonstrate that the reason articulated by Travelers is actually a pretext for age discrimination.  Id.

### i. Prima Facie Case

In order to establish a prima facie case for age discrimination under the MHRA, Chambers must show that (1) she was over forty; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) she was

replaced by someone who was substantially younger than her.  McGinnis v.

Union Pac. R.R., 496 F.3d 868, 875 (8th Cir. 2007) (citation omitted).

Both parties agree that Chambers was a member of a protected class and

that she suffered an adverse employment action.  Travelers contends, however,

that Chambers has failed to establish the second and fourth prong of the above

stated analysis.

Travelers argues that Chambers was discharged because of her work

performance, and thus she was not qualified for her job, and cannot meet the

second prong of the prima facie case.  The Court disagrees.  At this stage in the

McDonnell Douglas framework Chambers need not disprove Travelers' reasons

for terminating her, she need only prove that she was qualified for the position

she held.  Riley v. Lance, Inc., 518 F.3d 996, 1000 (8th Cir. 2008) (citation omitted).

Since Chambers had been performing her job for several years meeting the

expectations of Travelers, as evidenced by Chambers prior performance

evaluation, she has met this prong of the prima facie case.  Id.

Additionally, Travelers contends that Chambers cannot meet the fourth

prong of a prima facie case, because she was not replaced by someone

significantly younger.  Following Chambers termination, her responsibilities and

supervision of Chambers' staff was temporarily taken over by Patty McCarron, who was 51 years-old. Travelers ultimately hired Brent Rothgeb, who was 44 years-old, to take over many of Chambers' responsibilities and supervise the team of underwriters. It is not entirely clear from the record the extent to which McCarron permanently replaced Chambers with regard to Chambers' former duties. Rothgeb is eight years younger than Chambers. It is not clear that such an age difference constitutes a significant age difference. See Girten v. McRentals, Inc., 337 F.3d 979, 981 (8th Cir. 2003) (reasoning that a nine year age gap "may not be significant to demonstrate age discrimination"). The Court will however, assume, without deciding, that Chambers has established the fourth prong of the prima facie case, and thus established a prima facie case of age discrimination. See Loeb v. Best Buy Co., Inc., 537 F.3d 867, 872 (8th Cir. 2008) (citation omitted) (assuming without deciding that plaintiff had established a prima facie case). Accordingly, the Court will move onto the second step of the McDonnell Douglas analysis.

### ii. Non-discriminatory Reason

Travelers has articulated a non-discriminatory reason for Chambers' termination. Travelers proffers that Chambers was discharged because of

Chambers' management style, violations of Travelers' policies and procedures, as well as her judgment. Thus, the Court must move onto the third step of the McDonnell Douglas analysis to determine whether or not the proffered reason is actually pretextual.

### iii. Pretext

Once a defendant has articulated a non-discriminatory reason the plaintiff must show that the stated reason is in fact pretextual. Lewis, 467 F.3d at 1137. "At this stage, [Chambers] can avoid summary judgment only if the evidence considered in its entirety (1) created a fact issue as to whether [Travelers] proffered reasons are pretextual and (2) created a reasonable inference that age was a determinative factor in the adverse employment decision." Id.

To carry this burden of showing pretext, a plaintiff must show that the proffered justification for the adverse employment action is unworthy of credence. Erickson v. Farmland Indus. Inc., 271 F.3d 718, 726 (8th Cir. 2001). The methods which a plaintiff may use to demonstrate pretext include: (1) demonstrating that the proffered reason has no basis in fact, (2) demonstrating that the action the employer took was contrary to a policy or practice, (3) showing that it is unlikely that the employer would have acted on the proffered

reason, and (4) providing evidence of a discriminatory attitude in the workplace.

Id. at 727.  However, courts do not sit as "super personnel departments" and

should not substitute their own judgments for those made by employers, except

to the extent that those judgments involved intentional discrimination.  Hutson

v. McDonnell Douglas Corp., 63 F.3d 771, 781 (8th Cir. 1995).

At this stage of the analysis, Chambers cannot carry her burden to show

that Travelers proffered reason was pretext for discrimination or that age was a

determinative factor in her termination.  Chambers argues that a jury could

conclude that the fact that she was subjected to different and harsher treatment

than other employees shows pretext for her termination.  Chambers further

contends that neither Sandridge nor Werner was familiar with the

"environmental assessment" process, and that no other Managing Director in

Sandridge's unit had ever been subject to such an assessment.  Additionally,

Chambers argues that Travelers gave many different and contradictory reasons

for Chambers' termination.  For these reasons, Chamber argues the

"environmental assessment" was not a tool of investigation, but rather was a

mechanism used to justify Travelers already formulated desire to terminate

Chambers.  Plaintiff thus contends that the cursory nature of the investigation shows pretext.

The Court disagrees with Chambers' above stated arguments.  Although Chambers may feel that the Travelers' process was too harsh, she has not presented the Court with evidence that Travelers' reason for terminating her was, in fact, pretext for age discrimination.  "[E]stablishing that an employer's decisions were unwise or that its reasons for an adverse action were based on an erroneous interpretation of an employee's actions or on facts that are reasonably disputed does not prove that the employer's asserted reasons are pretextual." Jackson v. Lakewinds Natural Foods, No. 08-398, 2009 WL 2255286 at *4 (D. Minn. July 28, 2008).

Additionally, Chambers has failed to produce evidence which would allow a reasonable jury to draw a reasonable inference that age was a determinative factor in her termination.  Chambers has not supplied any evidence, other than her own speculation, that age was a factor in her discharge. The fact that Rothgeb, who is eight years younger than Chambers, took over many of Chambers' duties is insufficient evidence for a jury to find for Chambers.  Id.  Accordingly, since Chambers cannot show either pretext, or that

age was a determinative factor in her termination, Chambers' age discrimination claim must be dismissed.

### G. ERISA § 510 Claim

Chambers alleges in Count Five that Travelers violated ERISA § 510 by discharging her in order to prevent her from accruing additional pension benefits as well as to prevent her from obtaining severance benefits. Section § 510 of ERISA states that it is unlawful to discharge an employee for the purpose of interfering with any right which the employee may become entitled to under an ERISA plan. 29 U.S.C. § 1140. "To prevail under § 510, [Chambers] must show that [Travelers] 'had a specific intent to interfere with [her] benefits, but that may be shown by circumstantial evidence.'" Pendleton v. QuikTrip Corp., 567 F.3d 988, 992 (8th Cir. 2009) (citation omitted). Claims brought under § 510 are analyzed by using the McDonnell Douglas framework. Id.

To establish a prima facie case under ERISA § 510, Chambers "must show that (1) [Travelers] subjected [her] to an adverse employment action; (2) [she] was likely to receive future benefits, and (3) there was a causal connection between the adverse action and the likelihood of future benefits." Fischer v. Andersen Corp., 483 F.3d 553, 556 (8th Cir. 2007) (citation omitted).

### i. Pension Interference

Chambers cannot show a prima facie case of pension interference, because she cannot show a causal relationship between the adverse employment action and her likely receipt of future benefits.  Chambers has not produced evidence that Travelers' termination of Chambers was motivated by a specific intent to interfere with her future pension benefits.  Chambers argues that Travelers has stated that it intended to save more than $350 million through workforce reductions following the merger of Travelers and St. Paul Companies.  Chambers' argues that her pension benefits were accruing at a rate of $36,000 per year.  Moreover, Chambers asserts that her pension benefits would not have been terminated had she been given an opportunity to continue her employment with Travelers as an underwriter.  These facts do not, however, show a causal relationship between Chambers' termination and her receipt of future benefits.  Consequently, Chambers cannot establish a prima facie case, and her pension interference claim must be dismissed.

Even if she were able to show a prima facie case, her claim for pension interference under § 510 would fail because Chambers was fully vested in her pension benefits at the time of her discharge.  Travelers' policies state that

employees are one hundred percent vested once they have five years of vesting service.  In this case, Chambers had more years of vesting service then the required five years.  Although Chambers may have been able to accrue more benefits had she remained working with Travelers, "[w]here a vested employee is denied only the chance to accrue more benefits, a § 510 claim does not lie." Rudolph v. U.S. Bank Nat. Ass'n, No. 04-4581 (ADM/JJG), 2006 WL 1579862, at *7 (D. Minn. June 2, 2006) (citing Corum v. Farm Credit Servs., 628 F. Supp. 707, 718 (D. Minn. 1986).  Thus, even if Chambers had established a prima facie case, summary judgment would be granted with regard to Chambers' pension interference claim under § 510.

### ii.   Severance Interference

Chambers' severance interference must also fail because Chambers cannot establish a prima facie case with regard to her severance benefits. Chambers must be able to show that she was likely to receive severance benefits, and that there is a causal relationship between her termination and her possible receipt of those severance benefits.  Other courts have held that a § 510 claim does not arise for severance interference where an employee was terminated for cause. Pendleton, 567 F.3d at 993 (holding that the plaintiff could not establish a prima

facie case because under the language of the severance plan, he was not entitled to any benefits). Travelers' severance plan states that employees are entitled to severance if they were terminated due to a reduction in the workforce or if an employee's job was eliminated. The policy further states that an employee is not entitled to severance benefits if they are terminated due to poor job performance. In this case, Chambers was terminated for cause, and according to the language of the severance policy, Chambers was not entitled to any benefits because she was terminated for poor job performance. Thus, Chambers cannot establish a prima facie case and her severance interference claim must be dismissed.

Furthermore, even if Chambers could establish a prima facie case, her claim would fail because she cannot satisfy her burden to show that Travelers' articulated reason for terminating her was in fact pretextual and that interference with her ERISA benefits was a determinative factor in her termination. Chambers argues that her removal from her position was being discussed before she was ever informed of any concerns with her employment. Further, Chambers asserts that Travelers was planning to reduce the number of Managing Directors in St. Paul and that Travelers attempted to create another position for Chambers that did not fit her skill set. However, none of these

arguments establish that Travelers articulated reasons for discharging Chambers were pretextual.  Moreover, these arguments do not show that Travelers had the specific intent to interfere with Chambers' severance benefits.  Thus, Chambers' severance interference claim must be dismissed.

## V.     CONCLUSION

Accordingly, based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

Defendant The Travelers Companies, Inc.'s Motion for Summary Judgment [Docket No. 77] is **GRANTED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY**.


Date:  January 27, 2011                              s/ Michael J. Davis
                                                     Michael J. Davis
                                                     Chief Judge
                                                     United States District Court